# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| STATE OF NORTH CAROLINA DIVISION OF SERVICES FOR THE BLIND, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:17cv1058 |
| UNITED STATES DEPARTMENT OF EDUCATION, REHABILITATION SERVICES ADMINISTRATION, and LLOYD CHADWICK HOOKS, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Moving pursuant to the Randolph-Sheppard Act, 20 U.S.C. §§ 107-107f (the "RSA"), and the Administrative Procedure Act, see 5 U.S.C. §§ 701-706, the State of North Carolina Division of Services for The Blind (the "Plaintiff" or "NCDSB") seeks judicial review of an "Opinion and Award" dated September 26, 2017 (the "Arbitration Award"). (See Docket Entry 1 (the "Complaint/Petition") at 1.)[1] In response, Lloyd Chadwick Hooks (the "Defendant"), a blind vendor under the RSA, seeks confirmation of both the Arbitration Award and a supplemental arbitration award dated January 2, 2018 (the "Supplemental Award"). (See Docket Entry 14 at 8.) For the reasons that follow, the Court should

_____

1 Citations herein to Docket Entry pages use the CM/ECF footer's pagination.

affirm in part and vacate in part the Arbitration Award and affirm the Supplemental Award as specified herein.

**BACKGROUND**

This dispute arises from the procedures used to award a vending contract at a federal rest area along Interstate 85 in Davidson County, North Carolina (the "I-85 Rest Stop"). (See Docket Entry 1-1 at 1-5 (detailing procedural background in Arbitration Award); Docket Entry 19-1 at 10-13 (summarizing same matters in Plaintiff's opening memorandum); see also Docket Entry 20 at 8 (setting forth Defendant's agreement that Plaintiff's opening memorandum adequately summarized procedural history).) Prior to the underlying arbitration, Plaintiff and Defendant "stipulated to the following facts" (A.R. 341)[2] of relevance to this proceeding:

"[Plaintiff] is the State Licensing Agency [(the "SLA")] responsible for administering the [RSA] and for implementing related regulations." (Id.) "[Defendant] is a licensed operator in [Plaintiff's] Business Enterprises Program" (the "BEP"). (Id.) "Around August 2014, [BEP] operators were notified of an opening at the I-85 [Rest Stop]." (A.R. 342.) Defendant and other operators "submitted their application[s] to be considered for the I-85 [Rest

---

2  Citations to the "A.R." refer to the Administrative Record that Plaintiff and Defendant jointly filed in this matter. (See Docket Entry 17 at 1, 2; see also Docket Entries 17-1 to 17-7 (containing the Administrative Record).)

Stop]." (Id.) "An interview panel comprised of Clay Pope ([BEP] Chief), Steve Noble (Location Counselor), and Ron Eller (Vice-Chair of the Elected Committee of Blind Vendors) conducted all interviews . . . ." (Id.) "As part of the established interview process, discretionary points were awarded to all interviewees." (Id.) "Panel members Pope, Noble and Eller scored [Defendant] 8, 6, and 5 respectively on discretionary points." (Id.) "Panel members Pope, Noble and Eller scored the prevailing candidate 8, 6, and 8 respectively on discretionary points." (Id.)

"[Defendant] filed a written appeal to the Operator Relations Committee [(the "ORC")], which is a required step for an appeal in the [BEP]." (Id.) "[The ORC] entered a decision denying [Defendant's] appeal." (Id.) Next, "the [NCDSB] Director[] entered a decision upholding the ORC's determination." (Id.) "[Defendant] requested a Full Evidentiary hearing and one was held before [a] Hearing Officer . . . ." (A.R. 343.) "At the hearing, [Defendant] contended the established interview procedures were not followed and challenged the award of discretionary points by Mr. Eller." (Id.) "The hearing officer . . . den[ied Defendant's] appeal." (Id.) Thereafter, "[Defendant] filed a complaint with the United States Department of Education" (the "DOE"). (Id.)

The DOE convened an arbitration panel to adjudicate Defendant's complaint. (A.R. 327.) Defendant "submitted transcripts of the interviews conducted by the interview panel, ORC

hearing, and the transcript of the Full Evidentiary hearing to the Arbitration Panel." (A.R. 343.) A three-person arbitration panel[3] conducted a hearing on Defendant's complaint, at which counsel for Plaintiff and Defendant appeared and Defendant testified as a witness. (See A.R. 368-70.) After the hearing, a divided panel issued the Arbitration Award.

As relevant to this matter, the Arbitration Award found that "the SLA failed to conduct a give and take interview as a basis for awarding discretionary points [in] violat[ion of] 10A [North Carolina Administrative Code] § 63C.0204(d)(5)(F)." (A.R. 1161.) As a result, it ordered (i) that "[a]ll of the discretionary points awarded for filling the I-85 [Rest Stop] under subsection (5)(F) shall be deleted from the scoring records of all applicants;" (ii) that "[Plaintiff] shall reconstitute the original interview panel with the same members, interview all of the original eight applicants, record and transcribe all interviews as well as award points in accordance with subsection (5)(F) and its 5 + 5 practice;" and (iii) that "[Plaintiff] conduct the reconstituted interview within sixty (60) days following its receipt of th[e Arbitration Award]." (Id.) It further ordered (i) Plaintiff to "provide licensees with access to all relevant financial data

        3   Pursuant to the RSA, Defendant selected one arbitrator, Plaintiff selected one arbitrator, and those two arbitrators jointly selected a third neutral chair. See 20 U.S.C. § 107d-2(b)(1).

including, but not limited to, gross sales, gross profit, costs of goods sold, overhead expenses and net profit for the I-85 [Rest Stop] in accordance with 20 U.S.C. § 107b-1;" and (ii) the DOE and Plaintiff to "set aside all regulations prohibiting or restricting licensee access to relevant financial data under 20 U.S.C. § 107b-1." (Id.)

Finally, the arbitration panel ordered that, "[i]n the event [Defendant] has the highest point total after points are awarded by the reconstituted interview panel, he shall be assigned the I-85 [Rest Stop] and recover compensatory damages from [Plaintiff];" and that, "[a]s the prevailing party in his section (5)(F) claim, [Defendant] shall recover attorney fees," in an amount to be determined after further briefing. (A.R. 1162.) The Supplemental Award subsequently directed "the SLA [to] pay [Defendant's] attorney fees, expenses and costs in the amount of $52,965.02." (Docket Entry 14-1 at 24.)

## DISCUSSION

### I.  Relevant Standards

Under the RSA, "[a]ny blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a[n SLA] a request for a full evidentiary hearing." 20 U.S.C. § 107d-1. "If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the [DOE]

who shall convene a panel to arbitrate the dispute . . . ." Id.
"[T]he decision of such panel shall be final and binding on the
parties except," id., that the decision "shall be subject to appeal
and review as a final agency action for purposes of chapter 7 of
such Title 5," 20 U.S.C. § 107d-2(a), "that is, to judicial review
in accordance with the Administrative Procedure Act ([the] 'APA'),
5 U.S.C. § 500 *et seq.*, and, specifically, 5 U.S.C. § 706," Jones
v. DeNotaris, 80 F. Supp. 3d 588, 591 (E.D. Pa. 2015). See
also Sauer v. United States Dep't of Educ., 668 F.3d 644, 650 (9th
Cir. 2012) ("An arbitration decision under the [RSA] is 'subject to
appeal and review as a final agency action' under the standards set
forth in the [APA]." (quoting 20 U.S.C. § 107d-2(a))); Browder v.
United States Dep't of Educ., No. 99-2290, 238 F.3d 410 (table),
2000 WL 1724027, at *2 (4th Cir. Nov. 20, 2000) ("The underlying
arbitration panel decision we review today is deemed a final agency
action under the [APA].").[4]

---

[4] In the Supplemental Award, the panel majority asserted that
the Federal Arbitration Act (the "FAA") governs judicial review of
RSA arbitration awards. (See Docket Entry 14-1 at 4-10.) In
moving to confirm, Defendant likewise maintained that "[t]he [FAA]
applies to the [Arbitration] Award and the Supplemental Award."
(Docket Entry 14 at 9.) In subsequent briefing, however, Defendant
argued for confirmation solely pursuant to the APA (see, e.g.,
Docket Entry 20 at 43-44, 48), thereby abandoning his FAA argument.
Regardless, any contention that the FAA applies lacks merit. See,
e.g., Maryland State Dep't of Educ., Div. of Rehab. Servs. v.
United States Dep't of Educ., Rehab. Servs. Admin., No. CV 17-1383,
2018 WL 4604305, at *6-7 (D. Md. Sept. 25, 2018) (analyzing and
rejecting argument that either the FAA or a hybrid FAA/APA standard
governs appeal of RSA arbitration award).

The APA provides that, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  As relevant here, the reviewing Court shall also

> hold unlawful and set aside agency action, findings, and conclusions found to be —
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> >
> > (B) contrary to constitutional right, power, privilege, or immunity;
> >
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> >
> > (D) without observance of procedure required by law;
> >
> > (E) unsupported by substantial evidence . . .; or
> >
> > (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

5 U.S.C. § 706(2).  "In making [such] determinations, the [C]ourt shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error."  5 U.S.C. § 706.

In other words, as the United States Court of Appeals for the Fourth Circuit has explained, the Court "must uphold [an RSA arbitration panel] decision if it is supported by 'substantial evidence,' and is not 'arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.'" Browder, 2000 WL 1724027, at *2 (quoting 5 U.S.C. § 706(2)(A), (E)). Further, "[i]n determining whether final agency action," such as an RSA arbitration award, "violates [S]ection 706(2)(A) of the APA, '[the Court] perform[s] only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes, and whether the agency has committed a clear error of judgment.'" Id. (some internal quotation marks omitted) (quoting Maryland Dep't of Human Res. v. United States Dep't of Agric., 976 F.2d 1462, 1475 (4th Cir. 1992)).

## II. Sovereign Immunity Challenge

In its first assignment of error, Plaintiff asserts that the arbitration panel erred in awarding compensatory damages to Defendant if he wins the I-85 Rest Stop after the reconvened interview, arguing that "[t]he Eleventh Amendment of the United States Constitution prohibits th[e a]rbitration [p]anel from awarding compensatory relief and bars enforcement of such awards in federal court." (Docket Entry 1 at 9; see also id. at 8.)[5] Plaintiff makes the same contention regarding the award of attorney's fees. (See id. at 9.) In Plaintiff's view, "[t]he

_____

5  Plaintiff concedes that the arbitration panel could properly afford Defendant injunctive relief. (See, e.g., Docket Entry 19-1 at 7 ("[A] state cannot implicitly waive its sovereign immunity for compensatory damages by participating in a federal program.  Prospective equitable relief, however, is an appropriate remedy for parties due to state action in a federal program.").)

[a]rbitration [p]anel's decision to award attorneys' fees and compensatory damages violates the State of North Carolina's sovereign immunity." (Docket Entry 19-1 at 16.) Conversely, Defendant maintains that, "[a]s several Circuit courts have held, the [arbitration p]anel's award of compensatory damages and attorneys' fees is enforceable because North Carolina waived its Eleventh Amendment immunity when it voluntarily agreed to be an SLA under the RSA." (Docket Entry 20 at 9-10.)[6]

## A. RSA Background

Congress enacted the RSA in 1936 "'for the purpose of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting.'" Delaware Dep't of Health & Soc. Servs., Div. for Visually Impaired v. United States Dep't of Educ., 772 F.2d 1123, 1125 (3d Cir. 1985) (quoting Pub. L. No. 74-732, ch. 638, 49 Stat. 1559, 1560 (1936) (codified as amended at 20 U.S.C. §§ 107-107f)). To accomplish these objectives, the RSA (as originally enacted) authorized "blind persons licensed under the provisions of this Act . . . to operate vending stands in" certain "Federal and other buildings in [each participating] State." Id. (internal quotation marks omitted).

_____

6    Defendant does not dispute the applicability of the Eleventh Amendment to RSA arbitration proceedings. (See id. at 10 ("The Eleventh Amendment applies to this arbitration proceeding.").)

Section 3 of the original RSA envisioned the participation of States in the program through SLAs, by providing that "[a] State commission for the blind or other State agency desiring to be designated as the agency for licensing blind persons for the operation of vending stands as provided in this Act shall, with the approval of the governor of the State, make application to the Commissioner of Education and agree" to certain specified requirements. Id. at 1125-26. "Thus, as first enacted, the [RSA] contemplated a contractual relationship between participating states and the federal government." Id. at 1126.

In 1954, Congress "substantially" amended the RSA. Id. As part of this amendment, Congress increased the requirements for designation as an SLA. See id. As amended, Section 3 of the RSA mandated that "'[a] State commission for the blind or other State agency desiring to be designated as the licensing agency shall, with the approval of the chief executive of the State, make application to the Secretary and agree,'" inter alia, "'(6) to provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending stand program an opportunity for a fair hearing.'" Id. at 1126-27 (quoting Vocational Rehabilitation Amendments of 1954, Pub. L. No. 83-565, ch. 655, 68 Stat. 663, 664).

As the United States Court of Appeals for the Third Circuit has explained:

The 1954 amendment thus carried forward the contractual relationship feature of the original Act and added [a] requirement that the state agree that blind vendors have certain property interests in the businesses established pursuant to the [RSA]. The blind vendors became, in effect, third party beneficiaries of the agreements between the participating states and the federal government. Moreover the states applying to participate in the program undertook in [S]ection 3(6) to provide for blind licensees dissatisfied with the operation of the program "an opportunity for a fair hearing." The 1954 amendment did not, however, specify the nature of the hearing or the relief which should be afforded as a result of such a hearing. Nevertheless, it is clear that by authorizing the federal government to contract with the states on the terms specified in [S]ection 3, Congress intended to confer legally enforceable rights on the blind beneficiaries of the program. The term "fair hearing" cannot otherwise be understood than as an expression of the intention to require participating states to provide a mechanism of dispute resolution to effectively enforce those rights. States participating in the program after 1954 are so bound. In consideration of the states' undertakings, the federal government grants to state agencies the right to license federal sites to blind vendors.

Id. at 1127.

Twenty years later, Congress found, "[a]fter review of the operation of the blind vending stand program authorized under the [RSA], that the program has not developed, and has not been sustained, in the manner and spirit in which the Congress intended at the time of its enactment, and that, in fact, the growth of the program has been inhibited by a number of external forces." Rehabilitation Act Amendments of 1974, Pub. L. No. 93-516, 88 Stat 1617, 1617 (all-cap font omitted). Congress further found "that at a minimum [certain] actions must be taken to insure the continued vitality and expansion of the Randolph-Sheppard Program," including

"establish[ing] administrative and judicial procedures under which fair treatment of blind vendors, state licensing agencies, and the federal government is assured." Id. (all-cap font omitted). To that end, Congress added arbitration provisions to "provid[e] a means by which aggrieved vendors and State agencies may obtain a final and satisfactory resolution of disputes under the RSA." Kentucky, Educ. Cabinet, Dep't for the Blind v. United States, 424 F.3d 1222, 1226 (Fed. Cir. 2005) (internal quotation marks omitted) (observing that, "prior to the [1974] amendment[,] blind vendors and state licensing agencies had no neutral forum in which to press claims of violations of the RSA that did not involve violations of contract rights or federal procurement provisions").

Accordingly, Congress revised Section 3(6) to require agreement

> to provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending facility program an opportunity for a fair hearing, and *to agree to submit the grievances of any blind licensee not otherwise resolved by such hearing to arbitration as provided in section 5 of this Act [20 U.S.C. § 107d-1].*

Delaware Dep't of Health, 772 F.2d at 1127 (emphasis and brackets in original). In other words, Congress retained the Section 3 mandate that "states desiring to participate must 'make application to the Secretary and agree—'" to specified requirements, "add[ing] to [S]ection (3)(6) the requirement that participating states 'agree to submit the grievance of any blind licensee not otherwise

resolved in a fair hearing to arbitration' as provided in a new section of the [RSA]." Id. at 1128 (internal brackets omitted).

Notably, "[w]hen Congress in 1974 provided that states desiring to gain access to blind vendor locations in federal facilities must agree to submit to arbitration their disputes with blind vendors, the term arbitration had a well-recognized meaning." Id. at 1136; see also id. (observing that, "[s]ince contract arbitration was in 1974 a legal concept with a well-settled content, there is no ambiguity in [Congress's] choice of the term"). More specifically, by 1974, "arbitrators proceeding under the authority of the [FAA] or under the authority of the Uniform Arbitration Act, as a matter of course[,] awarded retrospective compensatory relief in appropriate cases." Id. In addition, "awards of back pay in arbitrations under collective bargaining agreements were, by then, commonplace." Id.

## B. Compensatory Damages Challenge

Against this backdrop, Defendant urges the Court to find that "North Carolina waived its sovereign immunity regarding [compensatory damages] when it voluntarily agreed to be an SLA." (Docket Entry 20 at 10.)[7] In turn, Plaintiff maintains that "the

---

7 "[A] State may waive its immunity by voluntarily participating in a federal spending program provided that Congress has expressed a clear intent to condition participation . . . on a State's consent to waive its constitutional immunity." Madison v. Virginia, 474 F.3d 118, 129 (4th Cir. 2006) (internal quotation marks omitted) (ellipsis in original); accord New Hampshire v.
(continued...)

Eleventh Amendment bars compensatory damages . . . against a state in a Randolph-Sheppard Arbitration." (Docket Entry 19-1 at 20.)[8]

Both positions find support in appellate decisions outside the Fourth Circuit. See, e.g., Tyler v. United States Dep't of Educ. Rehab. Servs. Admin., 904 F.3d 1167, 1193 (10th Cir. 2018) (finding that SLA "has not waived its sovereign immunity to a damages award from an RSA arbitration panel" (citing as a "*[b]ut see*" example Delaware Dep't of Health, 772 F.2d at 1138 (finding that SLA waived sovereign immunity through RSA participation)), cert. denied sub nom. Altstatt v. Fruendt, __ U.S. __, 139 S. Ct. 1214 (2019); Sauer, 668 F.3d at 654 (explaining that in Premo v. Martin, 119 F.3d 764 (9th Cir. 1997), the court "held that the [SLA] had waived its sovereign immunity by agreeing to participate in the Randolph-Sheppard program and that the arbitration panel was authorized to award compensatory damages"); Tennessee Dep't of Human Servs. v. United States Dep't of Educ., 979 F.2d 1162, 1165-69 (6th Cir. 1992) (concluding that RSA arbitrators possessed authority to award retroactive monetary damages, but eleventh-

_____

7(...continued)
Ramsey, 366 F.3d 1, 15 (1st Cir. 2004) ("A state can waive its Eleventh Amendment immunity to suit . . . by consent to or participation in a federal program for which waiver of immunity is an express condition . . . .").

8  "Because a [litigant] otherwise protected by the Eleventh Amendment can waive its protection . . . . sovereign immunity is akin to an affirmative defense, which [Plaintiff] bears the burden of demonstrating." Hutto v. South Carolina Ret. Sys., 773 F.3d 536, 543 (4th Cir. 2014).

amendment immunity precluded enforcement of such award in federal court); McNabb v. United States Dep't of Educ., 862 F.2d 681, 683-84 (8th Cir. 1988) (concluding that RSA arbitration panel could award prospective, but not retrospective, compensatory damages); see also McNabb, 862 F.2d at 685 (Lay, C.J., concurring & dissenting) ("agree[ing] with the Third Circuit's conclusion that the [E]leventh [A]mendment is not a bar to awarding compensatory relief against state agencies under the [RSA]," but finding, instead of waiver, that Congress "abrogate[d] sovereign immunity of the participating states" under the RSA).

Plaintiff and Defendant agree that the Fourth Circuit has not yet determined whether eleventh-amendment immunity precludes compensatory damages awards against an SLA in RSA proceedings. (See Docket Entry 19-1 at 18; Docket Entry 20 at 11.)  However, in an unpublished decision twenty-nine years ago, the Fourth Circuit briefly addressed the applicability of the Eleventh Amendment to compensatory damages awards in the RSA context.  See Morris v. Maryland, No. 89-1013, 908 F.2d 967 (table), 1990 WL 101396, at *6 (4th Cir. July 11, 1990).[9]  There, blind vendors sued under the RSA for, inter alia, the State's alleged improper collection of set-aside charges.  See id. at *1.  The district court dismissed the vendors' suit for failure to exhaust administrative remedies.

_____

9  The parties did not discuss this decision.  (See, e.g., Docket Entry 19-1 at 4-5 (listing cited authorities); Docket Entry 20 at 4-7 (same); see generally Docket Entry 21.)

See id.  On appeal, the vendors argued, in part, that "an administrative proceeding would have caused irreparable injury," id. at *2, on the theory that, "if the[ vendors] exhaust their administrative remedies, they would be required to pay [the] set-aside in the interim, but upon a later victory, recovery of the charges would be precluded by the State's eleventh amendment immunity," id. at *6.

The Fourth Circuit disposed of that argument as follows:

> But the set-aside currently being collected has now been approved by the Secretary; thus, it seems unlikely that the amount is being collected in violation of the [RSA].  The real issue in the merits of their case is whether the State properly collected set-aside prior to the Secretary's approval — any irreparable injury in that regard has already occurred.

> It is also doubtful whether eleventh amendment immunity would be available to the State if the vendors do eventually file for a review of the administrative proceedings.  *See Delaware Dep't of Health . . .*, 772 F.2d [at] 1136–37 . . . (eleventh amendment does not bar recovery from state pursuant to Randolph-Sheppard because the [RSA] requires the states to submit to arbitration, where damages are commonplace; hence, relationship is essentially contractual); *Committee of Blind Vendors* [*v. District of Columbia*], 695 F. Supp. [1234,] 1240–41 [(D.D.C. 1988)] (agreeing with the Third Circuit's analysis on the issue).  We, therefore, do not consider it "likely" that the vendors will suffer irreparable injury as a result of the exhaustion requirement.

Morris, 1990 WL 101396, at *6.

The Third Circuit's decision cited in Morris analyzed both the RSA arbitration panel's authority to award compensatory damages and the Eleventh Amendment's impact on such damages awards.  As to the first issue, the Third Circuit concluded that, in light of the

well-recognized practice of awarding compensatory damages in arbitration proceedings when Congress added the arbitration requirement to the RSA, the "unambiguous" statutory language, and the absence of "legislative history support[ing] any reading of the term arbitration other than the conventional one," RSA arbitration panels possessed authority "to award compensatory damages." Delaware Dep't of Health, 772 F.2d at 1136-37.  The Third Circuit then rejected the State's argument that the Eleventh Amendment barred such awards.  See id. at 1137 ("Thus Delaware's only remaining argument in support of vacating the arbitrators' award is that the eleventh amendment somehow authorizes it to withdraw unilaterally from an arbitration agreement which it made with the United States, acting in the interest of blind vendors.  That contention lacks merit.").  As to the latter issue, the Third Circuit concluded that Delaware "plainly . . . waived" eleventh-amendment immunity "when, after full notice of the [RSA's] requirements, one of which was an agreement to arbitration, it voluntarily made application with the Secretary to participate in the Randolph-Sheppard program.  The waiver of sovereign immunity with respect to arbitration could hardly have been made more clearly."  Id. (citations omitted).

Since the Morris and Delaware Department of Health decisions, however, the United States Supreme Court has clarified the standards for finding waivers of eleventh-amendment immunity.

17

See Sossamon v. Texas, 563 U.S. 277, 284-86 (2011) (finding that States did not waive sovereign immunity as to monetary damages under statute authorizing "appropriate relief against a government"). In particular, the Supreme Court explained that "a waiver of sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." Id. at 285 (internal quotation marks omitted). As such, "[w]aiver may not be implied." Id. at 284. Moreover, "a waiver of sovereign immunity to other types of relief does not waive immunity to damages[.]" Id. at 285. Rather, "[t]he waiver of sovereign immunity must extend unambiguously to such monetary claims." Id. (internal quotation marks omitted). Thus, "where a statute is susceptible of multiple plausible interpretations, including one preserving immunity, [a court] will not consider a State to have waived its sovereign immunity." Id. at 287.

As relevant here, the RSA provides:

> A State agency for the blind or other State agency desiring to be designated as the licensing agency shall, with the approval of the chief executive of the State, make application to the Secretary and agree —
>
> *****
>
> (6) to provide to any blind licensee dissatisfied with any action arising from the operation or administration of the vending facility program an opportunity for a fair hearing, and to agree to submit the grievances of any blind licensee not otherwise resolved by such hearing to arbitration as provided in [S]ection 107d-1 of this title.

18

20 U.S.C. § 107b (emphasis added). In turn, Section 107d-1 specifies in pertinent part that

> [a]ny blind licensee who is dissatisfied with any action arising from the operation or administration of the vending facility program may submit to a[n SLA] a request for a full evidentiary hearing, which shall be provided by such agency in accordance with [S]ection 107b(6) of this title. If such blind licensee is dissatisfied with any action taken or decision rendered as a result of such hearing, he may file a complaint with the Secretary who shall convene a panel to arbitrate the dispute pursuant to [S]ection 107d-2 of this title, and the decision of such panel shall be final and binding on the parties except as otherwise provided in this chapter.

20 U.S.C. § 107d-1(a) (emphasis added).

Entitled "[n]otice and hearing," Section 107d-2(a) states:

> Upon receipt of a complaint filed under [S]ection 107d-1 of this title, the Secretary shall convene an ad hoc arbitration panel as provided in subsection (b). Such panel shall, in accordance with the provisions of subchapter II of chapter 5 of Title 5, give notice, conduct a hearing, and render its decision which shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5.

20 U.S.C. § 107d-2(a). Finally, under the title "[c]omposition of panel; designation of chairman; termination of violations," Section 107d-2(b) specifies the procedure for appointing arbitrators for arbitrations between an SLA and federal entity as well as between an SLA and a blind licensee. See 20 U.S.C. § 107d-2(b). Notably, although it specifies the arbitration panel's scope of authority in

an arbitration between an SLA and federal entity,[10] Section 107d-2(b) provides no further details regarding arbitrations involving blind licensees.  Compare 20 U.S.C. § 107d-2(b)(2) (SLA-federal entity arbitration), with 20 U.S.C. § 107d-2(b)(1) (blind licensee-SLA arbitration).

Under these circumstances, and "[g]uided by *Sossamon*, [the Court should] conclude that the RSA is insufficiently explicit to render state participation in the RSA Program a waiver of sovereign immunity from an RSA arbitration panel award for damages." Tyler, 904 F.3d at 1193.  Because "the [RSA] is silent as to any type of remedy, only mandating the [arbitration p]anel's decision 'shall be final and binding,'" Ohio v. United States Dep't of Educ., 377 F. Supp. 3d 823, 838 (S.D. Ohio 2019), appeal filed, No. 19-3397 (6th Cir. Apr. 30, 2019), it qualifies as "open-ended and ambiguous about what types of relief it includes," Sossamon, 563 U.S. at 286. See Tyler, 904 F.3d at 1193 ("[The RSA] is silent as to what remedies aggrieved vendors may obtain against SLAs and is therefore

---

10  To wit:

> [i]f the panel appointed pursuant to paragraph (2) finds that the acts or practices of any such department, agency, or instrumentality are in violation of this chapter, or any regulation issued thereunder, the head of any such department, agency, or instrumentality shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel.

20 U.S.C. § 107d-2(b)(2).

just as 'open-ended and ambiguous' as [the statute at issue in Sossamon], if not more."); see also New Hampshire v. Ramsey, 366 F.3d 1, 21-22 (1st Cir. 2004) ("At best, there is disagreement as to whether the [RSA] arbitration panels can award damages, with reasoned arguments made on both sides."). Thus, because the RSA "falls short of the unequivocal textual expression necessary to waive State immunity from suits for damages," Madison v. Virginia, 474 F.3d 118, 131 (4th Cir. 2006), the Court should find that "[Plaintiff] has not waived its sovereign immunity to a damages award from an RSA arbitration panel," Tyler, 904 F.3d at 1193. See also Tennessee Dep't of Human Servs., 979 F.2d at 1168 ("[T]he [RSA] contains no mention of retroactive liability or of states' liability for, or immunity from, damages. A mere reference to binding arbitration in the [RSA] does not unmistakably suggest that a vendor will be able to collect retroactive damages in federal court or that a state will surrender its sovereign immunity. According to the Supreme Court, much more explicit language is required to abrogate or waive a state's sovereign immunity.").

### C. Attorney's Fees Challenge

Plaintiff's Complaint/Petition and opening memorandum assert only that eleventh-amendment immunity precludes the award of attorney's fees. (See Docket Entry 1 at 9; Docket Entry 19-1 at

16, 20.)[11]   Defendant responds that he "is entitled to his attorneys' fees because he was awarded non-monetary prospective relief" and because "[t]he Fourth Circuit has upheld the award of attorneys' fees in a Randolph-Sheppard challenge."  (Docket Entry 20 at 18 (emphasis omitted) (citing Almond v. Boyles, 792 F.2d 451, 456-57 (4th Cir. 1986) ("Almond")).)  Defendant's arguments possess merit.

In Almond, officials operating the RSA program in North Carolina deducted "employer" and "employee" retirement contributions from vending machine proceeds in violation of the RSA, depositing this money in the North Carolina Teachers' and State Employees' Retirement System (the "Retirement System"). See Almond v. Boyles, 612 F. Supp. 223, 225-26 (E.D.N.C. 1985) ("Almond I"), aff'd in part, vacated in non-relevant part, 792 F.2d 451 (4th Cir. 1986).  In 1983, the North Carolina General Assembly passed an act prohibiting any new blind vendors' participation in the Retirement System and requiring currently participating blind vendors to irrevocably elect one of several options regarding their Retirement System participation.  See id. at 226.  These options included ceasing participation in the Retirement System and

---

        11  Plaintiff's opening memorandum does not independently address the interplay between eleventh-amendment immunity and attorney's fees; rather, Plaintiff devotes its eleventh-amendment argument to compensatory damages and asserts without elaboration that the Eleventh Amendment also bars attorney's fees. (See Docket Entry 19-1 at 16-20.)

"receiv[ing] a refund of 'employee' contributions plus statutory interest," but "vendors were not given the option to withdraw both the 'employer' and 'employee' contributions from the [Retirement] System." Id.

Blind vendors filed suit under the RSA against officials administering both the RSA and the Retirement System, "seek[ing] declaratory and injunctive relief on behalf of themselves and all similarly situated Randolph-Sheppard vendors to recover all monies that they were forced to contribute to the [Retirement] System." Id. at 225. Granting the plaintiffs' summary judgment motion, the district court found that "[t]here was clearly a violation of the [RSA] in this case," and that "[t]he only equitable solution at this point is to give the vendors the option to withdraw from the Retirement System and receive a refund of their 'employer' and 'employee' contributions to the Retirement System plus statutory interest." Id. at 226-27.[12] The Almond I court then (i) granted

---

12 The Almond I court further found that eleventh-amendment immunity did not preclude recovery of the employer contributions from the Retirement System, see id. at 227-28, a ruling the Fourth Circuit affirmed, see Almond, 792 F.2d at 456. That ruling does not control the sovereign immunity analysis, however, as (i) it addressed only the question of "whether requiring the Retirement System to refund the vendors' 'employer' contributions would in effect be the same as a retroactive award of monetary damages against the state," Almond I, 612 F. Supp. at 227, without considering any interplay between the RSA and sovereign immunity, see id. at 227-28, and (ii), in any event, due to a subsequent Supreme Court decision, the framework Almond I used in that regard "is no longer applicable," Hutto, 773 F.3d at 546 (citing Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 431 (1997)).

class certification, (ii) ordered the preparation of class notices and an accounting of all "employer" contributions to the Retirement System, and (iii) required the Retirement System to "give members of the plaintiff class the option of receiving an immediate refund of both the 'employer' and 'employee' contributions to the Retirement System, reduced by the amount of benefits actually received, plus four per cent (4%) interest," id. at 230. See id. at 229-30.

The parties thereafter appealed to the Fourth Circuit, with the defendants challenging "the district court's order [sic] granting summary judgment and awarding attorneys' fees to plaintiffs," and the plaintiffs challenging "the interest component of the judgment." Almond, 792 F.2d at 455. The Fourth Circuit rejected the parties' contentions — mainly "for the reasons stated by the district court," id. at 456 (citing Almond I) — except that, "[w]ith respect to the award of attorneys' fees, [it] conclude[d] that the district court applied the wrong standard in calculating the award," id. The Fourth Circuit therefore vacated the attorney's fees award and remanded to the district court for it to recalculate the "appropriate attorneys' fees." Id. at 457.

Defendant maintains that, although the Fourth Circuit "upheld the award of attorneys' fees" in that RSA challenge "without substantial discussion, Almond remains binding precedent in the Fourth Circuit. Accordingly, the [arbitration p]anel's award of

attorneys' fees to [Defendant], as the prevailing party, should be affirmed." (Docket Entry 20 at 18.) Plaintiff's reply counters that Almond

> is not binding precedent regarding awards of attorneys'
> fees in [RSA] matters. First, the context in which
> attorneys' fees were awarded in that case bears no
> resemblance to this one. The award of attorneys' fees in
> *Almond* is also distinguishable from the present case
> because the *Almond* award was an exception to the American
> Rule.

(Docket Entry 21 at 7; see also id. at 8 ("Here, there is no applicable exception to the American Rule.").)[13] Plaintiff's contentions fall short.

To begin, Plaintiff fails to develop any argument related to its broad statement that "the context in which attorneys' fees were awarded in that case bears no resemblance to this one" (id. at 7). (See id. at 7-10.) "A party should not expect a court to do the work that it elected not to do." Hughes v. B/E Aerospace, Inc., No. 1:12cv717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014). Similarly, Plaintiff provides no support for its suggestion that the Court should strike the attorney's fees portion of the Arbitration Award because "the *Almond* award was an exception to the American Rule" (Docket Entry 21 at 7). (See generally Docket Entry 21.) Almond I contains no discussion of attorney's fees, see id.,

---

13 Under the so-called American Rule, a prevailing litigant in the United States "is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 247 (1975).

612 F. Supp. at 223-30, and <u>Almond</u> provides no explanation regarding the grounds for awarding attorney's fees, <u>id.</u>, 792 F.2d at 451-57. In addition, Plaintiff has not presented, and the undersigned has not found, the district court decision awarding attorney's fees. (<u>See</u> Docket Entry 21 at 7-10.) Accordingly, the Court cannot determine that <u>Almond</u>'s affirmance of the awarding of attorney's fees rests on a factual or legal foundation that materially differs from this case.

Conversely, a number of factors support the view that <u>Almond</u>'s upholding of an award of attorney's fees should control the outcome here. First, <u>Almond I</u> and <u>Almond</u> involve an award of attorney's fees against state litigants in conjunction with prospective equitable relief designed to remedy an RSA violation, the same situation involved in this case. Further, prior to the <u>Almond</u> decision, the Supreme Court had held that courts may award attorney's fees ancillary to injunctive relief in appropriate circumstances, and that such awards do not contravene the Eleventh Amendment when awarded against state litigants. <u>See</u> <u>Hutto v. Finney</u>, 437 U.S. 678, 689-700 (1978). The failure of the <u>Almond</u> defendants to raise a sovereign immunity challenge to the attorney's fees award on appeal, <u>see</u> 792 F.2d at 456, suggests that the attorney's fee award arose in the ancillary-to-injunctive-relief context. Under these circumstances, Plaintiff has not established that <u>Almond</u> "is not binding precedent regarding awards

26

of attorneys' fees in [RSA] matters" (Docket Entry 21 at 7).  <u>See</u>
<u>Doe v. Chao</u>, 511 F.3d 461, 465 (4th Cir. 2007) ("It is axiomatic
that in our judicial hierarchy, the decisions of the circuit courts
of appeals bind the district courts . . . ."); <u>see also</u> <u>United</u>
<u>States v. Collins</u>, 415 F.3d 304, 311 (4th Cir. 2005) ("A
[published] decision of a panel of this court becomes the law of
the circuit and is binding on other panels unless it is overruled
by a subsequent en banc opinion of this court or a superseding
contrary decision of the Supreme Court." (internal quotation marks
omitted)).

In its reply, Plaintiff next asserts that "[Defendant] relies
on *Tennessee Dep't of Human Servs.* to argue that the American Rule
does not apply."  (Docket Entry 21 at 8.)  However, Defendant did
not raise any arguments regarding the American Rule.  (<u>See</u> Docket
Entry 20 at 18-19 (asserting that the <u>Tennessee Dep't of Human</u>
<u>Servs.</u> "Court found that the Supreme Court has held that ancillary
costs to the state, such as attorneys' fees, are not barred by the
Eleventh Amendment if such costs are awarded only to a prevailing
party in regard to prospective relief").)  Further, to the extent
that Plaintiff's reply contends that the American Rule deprived the
arbitrators of authority to award attorney's fees, "[t]he ordinary
rule in federal courts is that an argument raised for the first
time in a reply brief or memorandum will not be considered,"
<u>Clawson v. FedEx Ground Package Sys., Inc.</u>, 451 F. Supp. 2d 731,

734 (D. Md. 2006). See, e.g., Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir. 1995) (explaining that "courts generally will not address new arguments raised in a reply brief because it would be unfair to the [other party] and would risk an improvident or ill-advised opinion on the legal issues raised"); HSK v. Provident Life & Accident Ins. Co., 128 F. Supp. 3d 874, 884 (D. Md. 2015) ("To the extent [the plaintiff] suggests that [the defendant's] non-compliance with the settlement agreement is an independent basis for liability, that argument is procedurally improper. By waiting to raise it until his reply brief, [the plaintiff] deprived [the defendant] of an opportunity to respond, and deprived this court of the benefit of any such response."). This rule has particular force here, given that the applicability of the American Rule to RSA arbitrations divides federal courts. Compare, e.g., Tennessee Dep't of Human Servs., 979 F.2d at 1169 (rejecting argument that American Rule applies to RSA arbitrations), with Tyler, 904 F.3d at 1194 (concluding that American Rule applies to RSA arbitrations).

Finally, Plaintiff's reply elaborates upon the position (to which it adverted in its Complaint/Petition and opening memorandum (see Docket Entry 1 at 9; Docket Entry 19-1 at 16, 20)) that, "[i]n the context of the [RSA], an award of attorneys' fees clearly violates North Carolina's Eleventh Amendment sovereign immunity." (Docket Entry 21 at 9.) In Plaintiff's view, "a state cannot have

reasonable notice that Congress intended it be subjected to attorneys' fees in [RSA] arbitrations where the act is silent on fee assessments to the parties and where Congress expressed an intent that certain costs be paid by the Secretary." (Id. at 10.)[14] As such, Plaintiff contends, the RSA lacks the necessary "unequivocal expression of congressional intent for a state to waive its immunity." (Id. at 9-10.) Plaintiff's assertions miss the mark.

In Hutto, the Supreme Court rejected a State's contention that an attorney's fee "award was subject to the Eleventh Amendment's constraints on actions for damages payable from a State's treasury." Missouri v. Jenkins by Agyei, 491 U.S. 274, 278 (1989).[15] "After Hutto, therefore, it must be accepted as settled

_____

14    Plaintiff's reply does not contend that awarding attorney's fees against an SLA runs afoul of the RSA due to the RSA's provision that the DOE "pay all reasonable costs of arbitration under this section in accordance with a schedule of fees and expenses . . . publish[ed] in the Federal Register," 20 U.S.C. § 107d-2(c). (See Docket Entry 21 at 9-10.) In any event, Plaintiff could not have raised such an argument for the first time in a reply brief. See Clawson, 451 F. Supp. 2d at 734.

15    In so ruling, the Hutto Court relied

     on the distinction drawn in [the Supreme Court's] earlier cases between "retroactive monetary relief" and "prospective injunctive relief." Attorney's fees, [the Supreme Court] held, belonged to the latter category, because they constituted reimbursement of "expenses incurred in litigation seeking only prospective relief," rather than "retroactive liability for prelitigation conduct." [The Supreme Court] explained: "Unlike ordinary 'retroactive' relief such as damages or
                                        (continued...)

29

that an award of attorney's fees ancillary to prospective relief is not subject to the strictures of the Eleventh Amendment." Id. at 279. Moreover, because "the Eleventh Amendment d[oes] not apply to an award of attorney's fees ancillary to a grant of prospective relief," Hutto's holding "is unaffected by [the Supreme Court's] subsequent jurisprudence concerning the degree of clarity with which Congress must speak in order to override Eleventh Amendment immunity." Id. at 280. Thus, the question of whether the RSA speaks with sufficient clarity to effect a waiver of a State's sovereign immunity has no bearing on an award of attorney's fees ancillary to prospective equitable relief.

In sum, Plaintiff's challenge to the attorney's fee award lacks merit.[16]

### III.  Discretionary Points Challenges

### A. Oral Exam/Interview

Plaintiff next maintains that the Arbitration Award erred in "finding [that Plaintiff] failed to conduct a give and take interview as a basis for awarding discretionary points in violation

---

15(...continued)
restitution, an award of costs does not compensate the plaintiff for the injury that first brought him into court.  Instead, the award reimburses him for a portion of the expenses he incurred in seeking prospective relief."

Jenkins, 491 U.S. at 278 (citations omitted).

16  Plaintiff does not challenge the calculation of the attorney's fee award.  (See Docket Entries 19-1, 21.)

of 10A N.C.A.C. § 63C.0204(d)(5)(F)" (the "Interview Subsection").
(Docket Entry 19-1 at 20 (capitalization and emphasis omitted).)
According to Plaintiff, (i) the Interview Subsection qualifies as
ambiguous (see id.), (ii) "[Plaintiff] interprets the statute to
provide for a single interview with the candidate with two scoring
components" (id. at 23 (citing A.R. 1171)), and (iii) "[Defendant]
was afforded a give and take interview that enabled the interview
panel to achieve its stated purpose of the interview, which is 'to
evaluate the applicant's expertise, maturity, experience and
ability'" (id. (quoting 10A N.C. Admin. Code § 63C.0204(d)(5)(F))).
In turn, Defendant contends that, "[a]s the arbitration panel
correctly found, [the Interview Subsection] unambiguously requires
that discretionary points be based on a 'give and take' interview,
and that did not occur." (Docket Entry 20 at 20.) Defendant's
position should prevail.

The North Carolina Administrative Code (the "Code") provides
that, "[a]fter adding together the points from the sanitation,
seniority, Financial Analysis/Operating Standards, Customer
Relations and Oral Exam/Interview Sections [Subparagraphs (d), (1),
(2), (3), (4), (5), (6), (7) of this Rule] for each applicant, the
applicant with the highest point total (if above 60 points) shall
be awarded the [BEP facility] vacancy." 10A N.C. Admin. Code
§ 63C.0204(c)(5) (second set of brackets in original). In regard
to the "Oral Exam/Interview Section[,]" the Code states:

(5) Oral Exam/Interview:

(A) 30 points maximum.

(B) Interview shall be face to face (no conference calls).

(C) All applicants shall be interviewed.

(D) The Interview Committee shall consist of:

*******

(E) The Oral Exam part shall consist of 10 questions drawn either from a pool of standard questions or developed by the Interview Committee prior to the interview. The oral exam questions shall relate to any special needs of the vacant facility as well as to standard responsibilities and knowledge areas of Business Enterprises operators. Each member of the Interview Committee shall evaluate the applicant's response to each question in the oral exam. The applicant shall receive one point by demonstrating basic knowledge, the applicant shall receive one and one-half points for demonstrating above average knowledge, and the applicant shall be awarded two points for demonstrating exceptional knowledge for each interview question. There shall be at least one question involving a calculation and a talking calculator shall be provided, although applicants may bring their own. The oral exam shall yield a possible 20 points.

(F) The interview part shall consist of a variety of questions in a give and take format. Each member of the Interview Committee shall evaluate the applicant's response to the interview questions and shall award up to 10 additional points based on the applicant's previous food service experience, knowledge and financial performance. If the applicant meets the requirements for the facility, the applicant shall receive five additional points. If the applicant's qualifications exceed the requirements of the facility, he may be awarded up to ten additional points. The interview shall include the following elements: questions related to business philosophy to promote general

discussion to enable the interview panel to evaluate the applicant's expertise, maturity, experience and ability; a discussion of any related work experience outside the [BEP]; at least two business math questions. Since points are awarded for seniority, time in the [BEP] shall not be considered as a reason to award points; however, relevant work experience in the [BEP] may be discussed and taken into consideration. Applicants may bring letters of recommendation, certificates, and other documents that would aid the Interview Committee in awarding its discretionary points.

(G) Each interviewer shall award discretionary points individually and the total score of Oral Exam and Interview points from each interviewer shall be averaged and added to the applicant's points from the other Sections.

10A N.C. Admin. Code § 63C.0204(d)(5) (the "Regulation").

Plaintiff asserts that the Interview Subsection qualifies as ambiguous. (See Docket Entry 19-1 at 20-23; Docket Entry 21 at 10-12.) As such, Plaintiff maintains, the Arbitration Award erred by not deferring to Plaintiff's alleged 20-year "policy" of interpreting the Regulation "to provide for a single interview with two scoring components." (Docket Entry 21 at 11; see also Docket Entry 19-1 at 20-23.) In Plaintiff's view, contrary to the arbitrators' findings, "there is no requirement for panel members to ask additional 'give and take' questions beyond the oral exam component or to do anything beyond what was done here." (Docket Entry 21 at 11-12.) Plaintiff's contentions warrant no relief.

First, as the Arbitration Award correctly found, the Regulation and Interview Subsection remain unambiguous on this

issue.  (See A.R. 1146-47.)[17]  The Regulation provides for an "Oral Exam part" consisting of ten preselected standardized "oral exam questions [that] relate to any special needs of the vacant facility as well as to standard responsibilities and knowledge areas of Business Enterprises operators."  10A N.C. Admin. Code § 63C.0204(d)(5)(E) (the "Oral Exam Subsection") (emphasis added). These oral exam questions must include "at least one question involving a calculation," and "[t]he oral exam shall yield a possible 20 points," id., towards the "30 points maximum" attainable in the "Oral Exam/Interview," 10A N.C. Admin. Code § 63C.0204(d)(5)(A).

The Regulation additionally mandates an "interview part [that] consist[s] of a variety of questions in a give and take format," which can yield "up to 10 additional points" towards the possible 30-point total.  10A N.C. Admin. Code § 63C.0204(d)(5)(F).  The Regulation further specifies the "elements" required for the "interview part," including "questions related to business philosophy to promote general discussion . . .[,] a discussion of any related work experience outside the [BEP, and] at least two business math questions."  Id.  Although cautioning that time in the BEP alone cannot "be considered as a reason to award points," the Regulation also permits "relevant work experience in the [BEP

---

    17  "[D]etermining whether a regulation . . . is ambiguous presents a legal question, which [the Court] determine[s] de novo. Humanoids Grp. v. Rogan, 375 F.3d 301, 306 (4th Cir. 2004).

34

to] be discussed and taken into consideration." Id. Finally, the Regulation instructs the Interview Committee to award the ten possible points for the "interview part" based on their "evaluat[ion of] the applicant's <u>response to the interview questions</u>." Id. (emphasis added).

Accordingly, the Regulation unambiguously requires both a ten-question "Oral Exam," 10A N.C. Admin. Code § 63C.0204(d)(5)(E), as well as a separate "interview" involving "a variety of questions in a give and take format," 10A N.C. Admin. Code § 63C.0204(d)(5)(F). Given that the Regulation's plain language mandates this two-part process, Plaintiff errs in contending that "there is no requirement for panel members to ask additional 'give and take' questions beyond the oral exam component" (Docket Entry 21 at 11-12). Rather, as the Arbitration Award correctly concluded, under the Regulation, "[Plaintiff] has no discretion to conduct or not conduct a 'give and take' discussion interview. [The Interview Subsection] has no ambiguity in that regard. A 'give and take' interview is required under the regulations. [Plaintiff] is obligated to conduct such interviews and award interview points." (A.R. 1146.)

Moreover, "[b]ecause the [R]egulation is not ambiguous . . .[,] deference [to Plaintiff's alleged interpretation[18]] is

———————————

18 "*Auer* deference" refers to the practice of "defer[ring] to agencies' reasonable readings of genuinely ambiguous regulations."
(continued...)

unwarranted." Christensen v. Harris Cty., 529 U.S. 576, 588

(2000). As the Supreme Court recently explained:

> [A] court should not afford *Auer* deference unless the
> regulation is genuinely ambiguous. *See* [*id.* at] 588;
> [*Bowles v.*] *Seminole Rock* [*& Sand Co.*], 325 U.S. [410,]
> 414 [(1945)] (deferring only "if the meaning of the words
> used is in doubt"). If uncertainty does not exist, there
> is no plausible reason for deference. The regulation
> then just means what it means — and the court must give
> it effect, as the court would any law. Otherwise said,
> the core theory of *Auer* deference is that sometimes the
> law runs out, and policy-laden choice is what is left
> over. *See supra*, at 2412 - 2413. But if the law gives
> an answer — if there is only one reasonable construction
> of a regulation — then a court has no business deferring
> to any other reading, no matter how much the agency
> insists it would make more sense. Deference in that
> circumstance would "permit the agency, under the guise of
> interpreting a regulation, to create *de facto* a new
> regulation." *See Christensen*, 529 U.S. at 588.

Kisor v. Wilkie, __ U.S. __, __, 139 S. Ct. 2400, 2415 (2019)

(parallel citations omitted). Because the Regulation does not

qualify as "genuinely ambiguous," id. at __, 139 S. Ct. at 2414,

deference to Plaintiff's alleged interpretation that "the

[Regulation] provide[s] for a single interview with two scoring

components" (Docket Entry 21 at 11) "is 'unwarranted,'" Kisor, __

U.S. at __, 139 S. Ct. at 2414.[19]

---

18(...continued)
Kisor v. Wilkie, __ U.S. __, __, 139 S. Ct. 2400, 2408 (2019).

19  Moreover, even assuming that the Regulation qualified as
ambiguous, Plaintiff has not established that this purported
interpretation reflects the "authoritative, expertise-based, fair[,
and] considered judgment," id., 139 S. Ct. at 2414 (internal
quotation marks omitted), of the agency tasked with administering
the RSA. As support for its purported policy, Plaintiff cites only
(continued...)

In addition, the Arbitration Award correctly determined that Plaintiff failed to afford Defendant the required interview.[20] Here, the interviewers asked Defendant ten questions, each of which he answered without further follow-up from any of the interviewers. (See A.R. 688-97.)[21] They then asked Defendant whether he had any

---

19(...continued)
to the conclusory statement in the Arbitration Award's dissenting opinion that Plaintiff interprets the Regulation as authorizing "a single face-to-face event with two scoring components" (A.R. 1171) and to Clay Pope's testimony at the full evidentiary hearing that "for the last 15 years or so" the oral exam/interviews have been done the "[s]ame way," with "the interview and oral exam" being "considered one and the same" (A.R. 54, 55). (See Docket Entry 19-1 at 23; Docket Entry 21 at 11.) Plaintiff has not shown, however, that the unsupported assertion of either the dissenting arbitrator or Clay Pope (chief of the BEP rather than of Plaintiff) represents the relevant "agency's 'authoritative' or 'official position,' rather than [a] more ad hoc statement not reflecting the agency's views." Kisor, __ U.S. at __, 139 S. Ct. at 2416. Absent proof that the alleged interpretation "at the least emanate[s] from those actors, using those vehicles, understood to make authoritative policy in the relevant context," the Court could not defer to the purported interpretation even if the Regulation actually suffered from ambiguity. Id., 139 S. Ct. at 2416.

20 Plaintiff suggests a de novo standard of review applies to the issue of whether "[D]efendant was . . . afforded a 'give and take' interview in accordance with [the Interview Subsection]" (Docket Entry 19-1 at 24). (See id. at 23-25; see also Docket Entry 21 at 12 ("Under any fair analysis the actions taken by these panel members would meet the requirements as set out in the [C]ode.").) Arguably, the challenged determination constitutes a factual finding subject to the substantial evidence standard. See 5 U.S.C. § 706(2)(E). Under any standard of review, however, the Arbitration Award correctly determined that Defendant did not receive the required interview.

21 At the time, Clay Pope (the head interviewer (see, e.g., A.R. 701)) called these questions the "interview questions" (A.R. 697), but he later described them as the "oral exam" (A.R. 58). The differing terminology apparently reflects his practice of
(continued...)

questions or wished to present anything. (<u>See</u> A.R. 697 ("All right. ·That concludes the interview questions. Now, [Defendant], any questions you have or anything you'd like to [inaudible] present?").) Defendant then presented "a few things" (<u>id.</u>), without interruption by, or discussion with, the interview panel (<u>see</u> A.R. 697-701). After Defendant's presentation, the interviewers declined to ask any further questions, at which point the transcript states: "Interview Concludes." (A.R. 701 (all-cap font omitted).)

This event does not satisfy the requirements for "[t]he interview part," 10A N.C. Admin. Code § 63C.0204(d)(5)(F), of the "Oral Exam/Interview Section[]," 10A N.C. Admin. Code § 63C.0204(c)(5). The Regulation specifies that "[t]he interview part shall consist of a variety of questions in a give and take format" that "promote general discussion." 10A N.C. Admin. Code § 63C.0204(d)(5)(F). "Give and take" signifies an "[e]xchange of talk, esp[ecially] of repartee," <u>Give and take</u>, Oxford English Dictionary, <u>https://www.oed.com/view/Entry/78556#eid2944361</u> (last visited Aug. 23, 2019), which in turn means, <u>inter alia</u>, "a lively conversation," <u>Repartee</u>, Oxford English Dictionary, <u>https://www.oed.com/view/Entry/162666</u> (last visited Aug. 23, 2019). The record reflects that no such exchange occurred here; instead,

---

21(...continued)
conflating the interview and oral exam, in which "the interview is an oral exam" (A.R. 56).

it reveals that (i) the interview panel conducted an oral exam (which contained no questions regarding at least one of the interview part's "elements," namely "related work experience outside the [BEP]," 10A N.C. Admin. Code § 63C.0204(d)(5)(F) (see A.R. 688-97)), (ii) asked Defendant a single additional question — "any questions you have or anything you'd like to [inaudible] present?" (A.R. 697) — and (iii) listened passively to Defendant's subsequent presentation (see A.R. 697-701).

In sum, the Regulation unambiguously requires both an Oral Exam and an Interview, which Plaintiff failed to provide to Defendant. Accordingly, the Court should affirm the Arbitration Award's "finding [that Plaintiff] failed to conduct a give and take interview as a basis for awarding discretionary points in violation of 10A N.C.A.C. § 63C.0204(d)(5)(F)" (Docket Entry 19-1 at 20 (capitalization and emphasis omitted)).

## B. Eller's Points

Plaintiff next contends that "there was no substantial evidence upon which the arbitration panel could reasonably conclude that Mr. Eller's [sic] awarded discretionary points arbitrarily." (Id. at 28.) In so arguing, Plaintiff urges the Court to apply the "[a]rbitrary and capricious standard" of "deferential review" to Eller's award of the ten potential points associated with "[t]he interview part," 10A N.C. Admin. Code § 63C.0204(d)(5)(F), of

Defendant's Oral Exam/Interview. (See Docket Entry 19-1 at 25-28.) The Court should reject these arguments.

As a preliminary matter, the Arbitration Award, not Eller's discretionary points determination, constitutes the "final agency action" subject to the APA's arbitrary and capricious review standard. See, e.g., Sauer, 668 F.3d at 650 ("An arbitration decision under the [RSA] is 'subject to appeal and review as a final agency action' under the standards set forth in the [APA]." (quoting 20 U.S.C. § 107d-2(a))); Browder, 2000 WL 1724027, at *2 ("The underlying arbitration panel decision we review today is deemed a final agency action under the [APA]."). In addition, because they did not afford Defendant the required interview, the interviewers' award of discretionary points for the interview component of the Oral Exam/Interview necessarily qualifies as arbitrary. See, e.g., Shipbuilders Council of Am. v. United States Dep't of Homeland Sec., 770 F. Supp. 2d 793, 800 (E.D. Va. 2011) (explaining that an agency's determination "lacked any evidentiary foundation and, therefore, violated the APA's prohibition against arbitrary and capricious decision making" (internal quotation marks omitted)).

Finally, substantial evidence supports the Arbitration Award's conclusion that Eller's consideration of information not disclosed during Defendant's Oral Exam/Interview violated the Regulation. (See A.R. 1147.) Plaintiff maintains that "[it] has consistently

interpreted [the Interview Subsection] to mean that an applicant's relevant history within the BEP program may be discussed and/or taken into consideration without any discussion of the same during the interview."  (Docket Entry 19-1 at 26.)  As support for this alleged interpretation, Plaintiff relies on Pope's description of awarding discretionary points (see id. (quoting A.R. 77)),[22] as well as on Eller's testimony that he awards discretionary points based on information that "[they] don't discuss [during] the interview" (A.R. 93; see Docket Entry 19-1 at 27 (citing A.R. 93)).  However, Plaintiff proffers no evidence that the individual interviewers' evidentiary hearing testimony as to their personal practices regarding discretionary points constitutes the pertinent "agency's 'authoritative' or 'official position' rather than a[] more ad hoc statement not reflecting the agency's views."  Kisor, __ U.S. at __, 139 S. Ct. at 2416.  Because Plaintiff fails to show that the

---

22  More specifically, the relevant testimony states:

Q. What is your definition of discretionary points?

A. The way I look at it is the way it goes in the rules. It should be awarded five points if they can do the job. And then from five to ten, it's really at your discretion what they presented, what I know about them as an operator, how they've performed, that kind of thing.

Q. So for each person on the panel it would be a subjective decision on how many points?

A. Right.

(A.R. 77.)

alleged interpretation "at the least emanate[s] from those actors, using those vehicles, understood to make authoritative policy in the relevant context," the Court could not defer to the purported interpretation even if the Interview Subsection qualified as ambiguous. Id., 139 S. Ct. at 2416; see also id., __ U.S. at __, 139 S. Ct. at 2414 (explaining that courts can defer only to an agency's "authoritative, expertise-based, fair[, and] considered judgment" (internal quotation marks omitted)).

In any event, as the Arbitration Award correctly concluded, the Regulation unambiguously limits discretionary point awards to material discussed during the interview. (See A.R. 1147 ("The regulations are clear, however. The awarding of points must be based on matters covered during an interview. No provision exists for ex parte or undisclosed considerations.").) The Interview Subsection specifies that "[e]ach member of the Interview Committee shall evaluate the applicant's response to the interview questions and shall award up to 10 additional points . . . ." 10A N.C. Admin. Code § 63C.0204(d)(5)(F) (emphasis added). It further details "elements" that the interview must include, such as "a discussion of any related work experience outside the [BEP]." Id. It then specifies that, "[s]ince points are awarded for seniority, time in the [BEP] shall not be considered as a reason to award points; however, relevant work experience in the [BEP] may be

discussed and taken into consideration." Id.[23]  Thus, the Interview

Subsection makes discussion of relevant BEP experience a

precondition to its consideration in awarding discretionary points.

Any other interpretation would impermissibly render superfluous the

phrase "discussed and."  See Shipbuilders Council of Am. v. United

States Coast Guard, 578 F.3d 234, 244 (4th Cir. 2009) ("In

interpreting statutes and regulations, [courts] have a duty, where

possible, 'to give effect' to all operative portions of the enacted

language, including its 'every clause and word.'").

Finally, substantial evidence[24] supports the Arbitration

Award's finding that Eller did not base his award of discretionary

points on information discussed during Defendant's "Oral

Exam/Interview." (A.R. 1147.)  Eller testified that he based his

discretionary points on three facts not discussed during the Oral

Exam/Interview:  Defendant's alleged purchase of "Gatorade at a

Sam's Club for his vending facility" (A.R. 1124), Defendant's

alleged month-long absence from his location, and Defendant's

---

23  In other words, the Interview Subsection permits, but does not require, an interview committee to discuss and consider relevant BEP experience in awarding discretionary points.

24  "[Substantial evidence] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted); see also Tyler, 904 F.3d at 1178 n.7 (explaining that, under the "substantial evidence and arbitrary or capricious . . . . standards, [a court] do[es] not overturn an agency's factual findings if 'a reasonable mind would consider the evidence adequate to support the conclusion reached'").

allegedly lenient sanitation grader.  (See A.R. 101-03; 842-44.)[25]

Therefore, substantial evidence supports the Arbitration Award's conclusion that "grader Eller also violated [the Interview Subsection] when he considered a Gatorade incident, an occasion when the petitioner was away from his facility as well as his sanitation grade."  (A.R. 1147.)

### C.  Remedy

To remedy the foregoing violations, the Arbitration Award ordered Plaintiff to delete the previous discretionary interview point awards, reconvene the same interview panel, and conduct proper interviews of "the original eight applicants."  (A.R. 1161; see A.R. 1148, 1149.)  It further ordered that, if Defendant "has the highest point total after points are awarded by the reconstituted interview panel, he shall be assigned the I-85 [Rest Stop] . . . ."  (A.R. 1162.)  Plaintiff raises the following challenge to this order:

> The arbitration panel's order that the licensing
> agency delete all discretionary points awarded for the
> I-85 [Rest Stop] contradicts the Department of Education
> approved licensing agency regulation 10A N.C.A.C.

---

25  Eller changed his testimony regarding the source of this information between the Grievance Hearing and the Full Evidentiary Hearing.  (Compare A.R. 101-03, with A.R. 842-44.)  However, he consistently testified that (i) he considered this information, which (ii) was not discussed in the interview.  (See, e.g., A.R. 92, 93, 101-03, 842-50.)  Eller further testified that, if he had not considered this information, he would have given Defendant "[p]ossibly a six" for discretionary points.  (A.R. 110.)  If Eller increased Defendant's point total at all, Defendant would have won the I-85 Rest Stop.  (See A.R. 342, 1125, 1126.)

§ 63C.0204 regarding the award of facilities.  The
arbitration panel's decision effectively creates an
arbitrary result, as any potential award of a location
that does not consider discretionary points directly
violates 10A N.C.A.C. § 63C.0204.

(Docket Entry 19-1 at 30, 31.)

This argument misconstrues the Arbitration Award, which merely
instructs Plaintiff to redo the interview with fresh discretionary
points awards, to ensure that the award of the I-85 Rest Stop
complies with the Regulation.  (See A.R. 1149 ("The original panel
. . . must be reconstituted to conduct (5)(F) interviews with each
of the applicants seeking a valid point total.  Prior (5)(F) points
shall be deleted from the total score of each applicant.  The
reconstituted panel shall conduct interviews with and award points
to all eight applicants and award points in accordance with
subsection (5)(F).  Each applicant's total score must be
recalculated.  Then the applicant with the highest score must be
awarded the I-85 [Rest Stop].").)  It does not, as Plaintiff
contends, direct the awarding of the I-85 Rest Stop without
considering discretionary points.[26]

Accordingly, Plaintiff's challenge to the remedy portion of
the Arbitration Award's conclusions regarding the handling of
discretionary points, like the related objections to the

---

26   Indeed, the Arbitration Award explicitly rejected the
prospect of omitting discretionary interview points from
applicants' scores.  (See A.R. 1148 ("The difficulty with this
alternative is its[] noncompliance with subsection (5)(F). . . .
The only remedy for noncompliance is compliance.").)

Arbitration Award's determinations about the inadequacy of the Interview and the arbitrary quality of Eller's assignment of points, entitle Plaintiff to no relief.

## IV.  Confidentiality Regulation Challenges

Lastly, Plaintiff challenges the Arbitration Award's order that "[t]he Agency and [Plaintiff] shall set aside all regulations prohibiting or restricting licensee access to relevant financial data under 20 U.S.C. § 107b-1" (A.R. 1161). (See Docket Entry 19-1 at 28-30.)[27]  This ruling originated with Defendant's request for certain financial information to calculate his compensatory damages claim.  (See A.R. 1150-56.)  Plaintiff refused to disclose such information (see A.R. 1150), on the grounds that "federal and state regulations prohibit disclosure of financial information under confidentiality provisions" (A.R. 1151).

The Arbitration Award found that these confidentiality provisions violated Section 107b-1 of the RSA, which provides:

_____

27  In that context, "Agency" apparently refers to the DOE. (See A.R. 1153-55, 1160-62.)  However, consistent with the federal statute, see 20 U.S.C. § 107d-2(b)(1) (providing for arbitration between SLA and blind vendor), the DOE took no part in the arbitration between Plaintiff and Defendant.  (See, e.g., Docket Entry 1-1 at 1 (identifying parties in Arbitration Award); Docket Entry 14-1 at 4 (acknowledging, in Supplemental Award, that "the agency is not named as a party").)  The arbitration panel thus lacked authority over the DOE.  Therefore, to the extent that Defendant requests wholesale confirmation of both awards (see Docket Entry 20 at 51), the Court should decline to enforce those aspects of the Arbitration Award and Supplemental Award that address the DOE.  See 5 U.S.C. § 706(2)(C).

46

> In addition to other requirements imposed in this title
> and in this chapter upon [SLAs], such agencies shall —
>
> > (1) provide to each blind licensee access to all
> > relevant financial data, including quarterly and
> > annual financial reports, on the operation of the
> > State vending facility program;

20 U.S.C. § 107b-1(1). As the Arbitration Award stated, "[t]his language is clear and unambiguous. It is not limited to quarterly and annual financial reports." (A.R. 1151.) In the arbitration panel's opinion, without information regarding a facility's "gross profit, cost of goods sold, overhead expenses[, and] net profit. . . .[,] a licensee may be making a financial mistake" in applying for a facility, and "Congress did not intend to take advantage of blind handicapped persons under the [RSA]." (A.R. 1152.) As such, the arbitrators concluded that "both federal and state regulations conflict with the statute. The regulations simply are not in accord with the statutory language. The regulations prohibiting licensee access to facility financial data must be set aside." (Id.)

Notably, in asking the Court to vacate this portion of the Arbitration Award, Plaintiff fails to address the arbitrators' ruling that the regulation conflicts with Section 107b-1 of the RSA. (See Docket Entry 19-1 at 28-30.) In turn, Defendant maintains only that this ruling "should be affirmed for the reasons provided by the Panel at [A.R.] 1150-56, which are incorporated [into Defendant's memorandum] by reference." (Docket Entry 20 at

50.)  The parties "cannot expect the Court to do [their] work for [them] . . . ."  Baptiste v. Capital One Bank (USA), N.A., No. CIV. 11-3535, 2012 WL 1657207, at *1 (D. Md. May 10, 2012).

Nevertheless, it bears noting that, in determining that certain state and federal regulations violated the RSA, the arbitrators overlooked the fact that the RSA distinguishes between "the operation [and] administration of the vending facility program," 20 U.S.C. § 107b(6), but the pertinent statutory provision addresses only the "operation" of such programs, 20 U.S.C. § 107b-1(1).  (See A.R. 1150-56.)  This distinction "invokes the rule that '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"  Brown v. Gardner, 513 U.S. 115, 120 (1994) (brackets in original). Moreover, this distinction carries particular relevance here given that the challenged state regulation specifically references the administration of the program.  See 10A N.C. Admin. Code § 63C.0206 ("All information and records pertaining to participants in the [BEP] shall be confidential and may not be revealed except in the administration of the program, by the consent of the participant, or as otherwise required by law.").  Further, as the arbitrators themselves posit, arguably the state regulation permits disclosure

of the disputed facility financial information in connection with filling a facility vacancy.  (See A.R. 1151.)

In addition, that Section 107b-1's "language is clear and unambiguous" insofar as "[i]t is not limited to quarterly and annual financial reports" (id.), does not automatically mean that Section 107b-1 mandates the disclosure of all information obtained in the "operation or administration of the vending facility program," 20 U.S.C. § 107b(6).  Indeed, Section 107b-1 limits the permissible information to "relevant financial data" rather than "all financial data," see 20 U.S.C. § 107b-1(1), suggesting that licensees should have access only to certain operation-specific financial information.  Such information might include, for instance, information regarding accrued vending machine income, see 20 U.S.C. § 107d-3(c).  However, neither the arbitrators nor Defendant point to anything in the RSA suggesting that the "relevant" financial data encompasses the desired facility-specific information (see A.R. 1150-52; Docket Entry 20 at 50), and Plaintiff merely asserts, without support or elaboration, that "[f]inancial data of individual blind vendors' sales performance is not relevant to 'the operation of the State vending facility program.'"  (Docket Entry 19-1 at 29 (quoting 34 C.F.R. § 395.12).)

In sum, the arbitrators' reasoning, which Defendant adopts, does not clearly establish that the challenged "regulations conflict with the statute" (A.R. 1152), and, in any event,

Plaintiff's sovereign immunity effectively moots the need for disclosure of the disputed information, as Defendant cannot recover compensatory damages. Under these circumstances, the Court should decline to enforce this portion of the Arbitration Award.

## CONCLUSION

Sovereign immunity precludes the Arbitration Award's contingent grant of compensatory damages, but not its award of attorney's fees. In addition, the Arbitration Award correctly determined (i) that Plaintiff violated the Regulation by failing to conduct the required give and take interview, (ii) that Eller violated the Regulation by basing his discretionary points award on undisclosed considerations, and (iii) that Plaintiff must re-award discretionary points after conducting proper interviews. However, the Court should not enforce the Arbitration Award's directive regarding disclosure of financial information.

**IT IS THEREFORE RECOMMENDED** that the Complaint/Petition (Docket Entry 1) be granted in part and denied in part as follows:

1. The Arbitration Award be vacated insofar as it authorizes compensatory damages. (See Docket Entry 1-1 at 51.)

2. The Arbitration Award and Supplemental Award be affirmed in their award of attorney's fees. (See id.; Docket Entry 14-1 at 24.)

3. The Arbitration Award be affirmed in its findings that Plaintiff and Eller violated the Regulation. (<u>See</u> Docket Entry 1-1 at 50.)

4. The Arbitration Award be affirmed in ordering the deletion of previous discretionary point awards. (<u>See</u> <u>id.</u>)

5. The Arbitration Award be affirmed in ordering Plaintiff to reconstitute the original interview panel, perform the required give and take interviews with all eight original applicants, award discretionary points based only on information disclosed in such interviews, in conformity with the Regulation (<u>see</u> <u>id.</u>), and award the I-85 Rest Stop to Defendant if he "has the highest point total after points are awarded by the reconstituted interview panel" (<u>id.</u> at 51).

6. The Arbitration Award be vacated insofar as it orders Plaintiff to set aside confidentiality regulations and provide blind licensees access to specified financial information. (<u>See</u> <u>id.</u>)

This 23rd day of August, 2019.

/s/ L. Patrick Auld<br>
**L. Patrick Auld**<br>
**United States Magistrate Judge**